## No. 16,249.

CITIZENS UTILITIES COMPANY *v*. CITY OF LA JUNTA ET AL.

(215 P. [2d] 332)

Decided February 6, 1950.

Mr. MILTON S. GOULD, Mr. LAWRENCE THULEMEYER, Mr. J. L. RICE, for plaintiff in error.

Mr. CHAS. E. SABIN, Mr. ROBERT R. SABIN, Mr. PERRY E. WILLIAMS, Mr. WILLIAM L. GOBIN, Mr. COVER MENDENHALL, Mr. WILLARD J. ALLEN, Mr. FRED E. SISK, Mr. L. E. LANGDON, Mr. MYLES P. TALLMADGE, Mr. BYRON G. ROGERS, for defendants in error.

*En Banc.*

MR. JUSTICE HAYS delivered the opinion of the court.

WE will herein designate the parties as they appeared below, viz., City of La Junta, et al., as petitioners; Citizens Utilities Company, as intervener; and the Public Utilities Commission of the State of Colorado, as commission.

This action was brought by petitioners to review a decision of the commission approving distribution to local consumers of natural gas of one-half of a fund of $176,278.82, held in the custody of the United States circuit court of appeals, and the other half thereof to the intervener for rehabilitation of its local pipe lines said to have rapidly deteriorated because of peculiar soil conditions.

The trial court reversed the decision of the commission, in so far as the same authorized the distribution of one-half of said fund to the intervener, and sustained it in all other particulars.

The intervener, during all times herein mentioned, operated plants for the distribution of natural gas at retail to consumers in the city of La Junta and in and near surrounding municipalities, pursuant to rate schedules filed with, and approved by, the commission. The intervener purchased said gas at wholesale from Colorado Interstate Gas Company, and the rates paid by the ultimate customers of the intervener were based, inter alia, upon those paid to the Interstate Company.

As a result of proceedings instituted March 14, 1939, before the Federal Power Commission, the Interstate Company was ordered March 18, 1942, to reduce its wholesale rates to the intervener. Thereafter an appeal was taken by the Interstate Company to the circuit court of appeals where it obtained a stay of the Power Commission's order reducing said wholesale rates, and permitting the use of the old rates, pending appeal, on

condition that the Interstate Company deposit with said court, out of wholesale charges collected, the difference between the rates then charged by the Interstate Company and the lower rates prescribed by the Power Commission. During the pendency of said appeal in the circuit court and in the United States Supreme Court, viz., from May 20, 1942, to September 25, 1945, to which we hereinafter refer as the impoundment period, there accumulated in said fund, on account of the said deposits, the sum of approximately $176,278.82, plus interest to date, which fund forms the subject matter of this controversy.

The order of the Power Commission reducing said wholesale rates was sustained on appeal. *Colorado Interstate Gas Co. v. Federal Power Commission,* 142 F. (2d) 943, 324 U. S. 581, 65 Sup. Ct. 829, 89 L. Ed. 1206, and the fund is still held subject to order of the circuit court of appeals, awaiting proper determination as to its disposition.

Following the affirmance by the United States Supreme Court of the order of the said Federal Power Commission, the intervener made application to the circuit court of appeals for an order authorizing the payment of the fund to said intervener, claiming that it was entitled to the fund as of right since it was created by payments made by the intervener to the Interstate Company, which application was, on November 9, 1945, denied without prejudice. Thereafter upon request of Public Utilities Commission the Court withheld distribution of the fund pending action of said commission.

November 5, 1945, following a series of conferences between the commission, the intervener and respective counsel, there was filed before the Public Utilities Commission upon its own motion a proceeding entitled "In re rates, practices, rules and regulations of the Citizens Utilities Company," case No. 4932 on the docket of said commission, which was initiated by the filing of a

"statement" otherwise referred to as "Decision No. 25102."

Following the hearing on the above complaint or decision, it was determined, in so far as pertinent, on January 14, 1949 (Decision No. 27319), that the impounded fund belonged solely to the intervener's customers who had purchased gas during the impoundment period, and that the intervener had no interest therein.

Thereafter intervener petitioned the commission for a rehearing in which it claimed to be the sole owner of said fund, but purposed that in the event the same was turned over to it, that one-half thereof would be paid to the consumers and the other half used by intervener to rehabilitate its mains and connections which, as said, had eroded because of unusual local soil conditions.

Thereafter, and on January 3, 1948, there was filed "Commissioner's Supplemental Order" (Decision No. 29685) wherein the commission again found that the ultimate local customers of gas were the sole owners of said fund, but nevertheless, because of some doubts said to exist as to the regularity of the proceedings and the jurisdiction of the commission, accepted intervener's proposal and thereupon ordered that one-half of said fund should be awarded to intervener for the replacement of its mains and connections.

Subsequently, on January 31, 1948, petitioners herein and customers of intervener, during the impoundment period, brought this action in the district court against the Public Utilities Commission to review the proceedings before said commission and in due course, in response to a citation, the commission certified its complete records to the court. Thereafter, Citizens Utilities Company intervened and, following denial of its motion to quash the writ and dismiss the case, answered, in which answer it challenged the jurisdiction of the court to review, and the right of petitioners to maintain the action, again asserting that the commission, whose proceedings were to be reviewed, had no jurisdiction or

authority to order the funds, or any part thereof, paid to intervener's customers, "except upon the request and with the consent of this intervenor * * *."

The trial court on January 4, 1949, following the trial on the issues raised by the pleadings, found in favor of petitioners and against the intervener; reversed the commission in so far as it authorized the distribution of one-half of the fund to intervener; and affirmed its action in all other particulars. The judgment of the trial court to the above effect is here for review.

Four days before the case was docketed in this court, April 22, 1949, and on to wit, April 18, 1949, all of the questions advanced by intervener as to the ownership of said fund, were conclusively decided adversely to its contentions in *Federal Power Commission v. Interstate Natural Gas Co.*, 336 U. S. 577, 69 Sup. Ct. 775, 93 L. Ed. 739, the opinion being delivered by Mr. Justice Douglas. The following are excerpts therefrom:

"The basis of the claim stated in their petitions for intervention is that they are entitled to the fund as of right, since it was created by their payments. But we would be unmindful of the purpose of the Act and the responsibility of the federal courts under it, if we so ruled. The aim of the Act was to protect ultimate consumers of natural gas from excessive charges. See *Federal Power Commission v. Hope Natural Gas Co., Supra.* They were the intended beneficiaries of rate reductions ordered by the federal commission, though state machinery might have to be invoked to obtain lower rates at the consumer level. The rates charged a wholesaler are part of its costs, reflected in its rate base. Reduction of those costs normally will lead in due course to reduction in its resale rates, unless we are to assume that the passage of the Natural Gas Act was an exercise in futility. * * *

" * * * It is the responsibility of the court which distributes the fund accumulated under its stay order 'to correct that which has been wrongfully done by virtue

of its process.' *United States v. Morgan,* 307 U. S. 183, 197. That responsibility plainly cannot be discharged by payment of the fund to those who show no loss by reason of the court's action.

"* * * The federal court, through exercise of its power under §19 of the Act, issued the stay order under which the fund was accumulated. When a federal court of equity grants relief by way of injunction it has a responsibility to protect all the interests whom its injunction may affect. *Inland Steel Co. v. United States,* 306 U. S. 153. It assumes the duty to make disposition of the fund in accord with equitable principles. * * * If in a particular case the court reaches the question of reasonableness of rates, it does so only for purposes of distributing the fund for whose creation it alone was responsible. It does not fix or prescribe rates for the past or the future. The reasonableness of rates charged by the companies who claim the fund is wholly ancillary to the problem of determining what claimants are equitably entitled to share in it. See *Atlantic Coast Line R. Co. v. Florida,* 295 U. S. 301; *United States v. Morgan, supra.*

* * *

"* * * If clear and speedy state remedies are available, the federal court might hold the fund until those having the final say on the state law questions have spoken. Cf. *Thompson v. Magnolia Petroleum Co.,* 309 U. S. 478, 483; *Spector Motor Co. v. McLaughlin,* 323 U. S. 101. But in the absence of such a showing the federal court in the interest of dispatch should proceed to determine the questions, relying on such sources of local law as may be available, including information from state regulatory agencies. The federal court may in its discretion disburse the funds directly to either the local distributing companies or the ultimate consumers or work out an administrative scheme whereby the distribution is made pursuant to directives of state agencies.

"In conclusion, the task of the federal court in distributing the fund accumulated by virtue of its stay order is to undo the wrong which its process caused. The basic problem, therefore, is not to fix rates but to determine who suffered a loss as a result of the court's action in granting the stay. What in fact would have happened as a consequence of federal or state law if the stay had not been issued, no one can know for a certainty. But the federal court must make its prognostication, whether an excursion into federal or state law questions is entailed. Distribution of the fund should not involve prolonged litigation. It is an administrative matter involving the exercise of an informed judgment by the federal court and should have the flexibility and dispatch which characterize the administrative process."

█ From the foregoing opinion of the United States Supreme Court and authorities therein cited, it is conclusively established that the intervener's customers, during the impoundment period, are the sole owners of the fund in question; that the intervener has no right, title or interest therein; and that the fund is held in trust for those from whom it was unlawfully taken.

The intervener's schedule of rates, which were in effect during the impoundment period, were at all times on file with, and approved by, the commission, and, so far as this record shows, there was no deviation therefrom. It necessarily follows that no valid claim against the intervener could be made for such period by the petitioners for reparations or damages, and likewise no valid claim could be made by intervener against Colorado Interstate Gas Company for overcharges. It is simply a situation where the Interstate Company collected from the ultimate customers of the intervener excessive charges, using the intervener as a catspaw therefor. The intervener has shown no loss by the transaction because it collected from its customers all

that it was entitled to receive under its schedule of rates.

Originally there was in the fund something over eight million dollars which accumulated as a result of overcharges paid to the Interstate Company by distributors in Denver, certain northern Colorado cities and towns, Pueblo, Colorado Springs, and Cheyenne, Wyoming, which distributors occupy the same relative position as intervener herein. No part of said fund was paid to, or claimed by, any of said distributors, and all of said fund, except the part here in question, has now been paid to the ultimate gas consumers which were found by the federal court to be eligible to receive the same.

The intervener, having no right, title or interest in the fund, is in no position to raise technical objections in proceedings in which it is not concerned, and should not be permitted to further delay the distribution of said fund among its rightful owners.

The judgment of the trial court is accordingly affirmed.